May it please the court. I think that the facts are agreed upon in the case. The issue is going to be, it seems to me, the law. To briefly summarize, I think everyone agrees that Mr. Thomas was in a vulnerable medical condition, suffered from very serious, as the district court said, very serious ailments. Everyone also agrees that the MSB unit was not able to administer acute care. Everyone agrees it had no vasodilator, no intravenous Lasix, no 24-hour medical care, no radiologist, no x-ray. So obviously something had to be done to make sure that patients who were not in a medically stable condition had to be seen by a doctor and identified. Everyone also agrees that a doctor was necessary to transfer a patient. That medical approval was needed. And that appellee agrees with that, too. What Dr. Warner's information, which is contained at the end of the excerpt of record, beginning at page 19, shows is a pattern of indifference, which is documented by Dr. Warner and documented in the records. And briefly, without going into a lot of talk about this, on March 13, his edema was 4+, which is the most serious form of edema. No doctor is called. March 15, his feet are swollen, his feet are red, danger signs, no doctor is seen for seven days. And March 18... Can I just interrupt for a moment to tell you what my concern is regarding this case? Sure. In order for the county to be liable, there has to be some linkage to a county policy. So what is the county policy you are alleging was responsible for the injuries? Okay. Here's the issue. It's either a policy or the absence of a policy. And what I found here to be absent was that there was no systematic... First of all, there were no guidelines on when a doctor would see a patient. No guidelines, no policy on when a doctor would be contacted. That's why Dr. Warner's declaration is so telling. All these indicia of serious medical needs and no doctor is contacted. No one telling the nurse, you must contact a doctor. How do you answer the other side's complaint that to do that, they'd have to micromanage every single possible occurrence that could take place and then say, in this instance, if the temperature is this, you must call a doctor, if the whatever is that, and it would be impossible to have that level of detail in a policy. Interestingly, the only guidelines that they do submit, which are guidelines concerning when to use an ambulance, when transportation is ordered, and that's at the supplemental expert record at around 77 and 78, do list different types of ailments. But the response to that is to say that when a patient is not in a medically stable condition, you must contact a doctor. Must. A doctor must see the doctor in that event, not placed on the doctor's line. A broad guideline just saying that that policy must be enforced and then people must be trained to adhere to that. These nurses were not trained. When you see Dr. Warner's declaration, it's devastating because of all the indicia of failure. Ultimately, what was the proof in the pudding was that here a patient falls and is on the floor of his cell in his own feces, and no doctor is required to see that patient. So the policy, to answer your question, is any time, number one, any time a patient is not medically stable, a doctor must be immediately contacted if a patient has a serious medical condition. Counsel, what's your best case authority for the proposition that the absence of a policy may lead to liability under Section 1983? Well, there are two basic areas. One is I think that Canton, when you have a failure to train, it's another adjunct of the failure to have a policy. In Canton, they left a woman lying on the floor for an hour. That was the violation. I see failure to train as a little different than absence of a policy. Do you have a case that specifically addresses the absence of a policy? I think my best case is Oviatt v. Pierce. And in Oviatt, what you see is, you know the facts of Oviatt, I know. But what you have there is a situation where you know that people should be released, and there's absolutely no way of keeping, they have no way of keeping track. So they didn't make any effort to keep track so they would know that people were released, so that if there was a need to release, they had no organized way of keeping track. This is the same thing. It's monitoring the serious medical condition of an inmate in a vulnerable position. They said in Oviatt that many of the people, the detainees, were illiterate or unable to take care of themselves. They were in a vulnerable situation. That's what they said in Oviatt. Here as well, you have people who suffer from hypoxia, where the oxygen is reduced, and they fall out of bed. They're disoriented. They cannot get their own medical care. In fact, he asked for medical care on the 20th of March and was denied medical care for days after that. So what you have is, number one, a failure to have a policy to immediately summon medical care, and number two, a tremendous failure to train. And my best case on failure to train is Gibson. And in that case, Gibson, as I know you're familiar with that one, is where in Gibson you have vulnerable, again, vulnerable people. A person comes in with mental illness. That person is vulnerable. And what they said at page 1189 of Gibson was there was a failure to respond to the need. That is it. The failure to respond to the need. This person came in suffering from serious ailments, and it wasn't the one hour in Canton that they failed to respond in Canton.  Eighteen days. It wasn't one incident. It was numerous, numerous nurses over the course of 18 days. And what they said... Your worst fact seems to be at the end, where he, as you say, falls out of bed and all of that. But in that one, they did call the doctor. The doctor was told what had happened, and the doctor decided that he didn't need to see him. Now, how do we distinguish that from sort of difference of opinion, medical malpractice kind of thing? That is the perfect illustration. That's the perfect evidence, if I'm presenting this case to a jury. What that doctor not only said is that he didn't need to see him, he said there was no policy requiring him to see him or to review the medical records. And that's what the district court also cited. Right. Maybe no policy, but shouldn't he have made an independent medical judgment of whether he did or did not need to see him? And if he decided that he didn't, why isn't that just medical malpractice? Well, I think it's indifference. I think the failure to require a doctor to see a patient, and this is, I think, a jury trial. Two experts, Dr. Rosenfeld and Dr. Warner, concluded, and they're experienced experts, that the failure to have a policy in this situation demonstrates deliberate indifference. Because what you have to do is you have to say to the doctor, telephone therapy is not enough here. You have to go and examine the patient and see the patient. Because only a doctor can transfer the person to USC, to the hospital. Only a doctor can make that call. A nurse can't do it. So what did he do? He did everything in conformity with the policy. Have him lie on the ground, away from any call button, on a two-inch egg crate mattress in his own feces. This was in conformity with the policy, and the doctor admitted it was. What better illustration than I have a triable issue of fact, than that that is the byproduct of this type of indifference and this type of lack of training. That's what you get, and that's what you get by a seasoned doctor. What was the policy that the doctor was adhering to? A policy of, as the district court said, a policy of the doctors and nurses can basically fend for themselves. That it is all up to the doctors and nurses with no guidelines. In Gibson, as you know, there was a nurse there that was involved in Gibson, but that nurse, at page 1195, they said that the deficiency was not requiring that nurse to act. That was what the Gibson court said. That nurse was not required to act. And here, the same thing. A doctor is involved, that doctor was not required to act. And that was the problem with what they did. In the district court's opinion, she really found that there was neglect. You have just about a minute. Do you want to save some time for rebuttal? Yes. Could I save this minute? Yes. Thank you. Good morning, Your Honors. My name is Lily Hsu for a dependent in FLE County of Los Angeles. Your Honors, I've made pretty much the points that I was going to make, but I'd just like to reiterate a couple of key things. Well, what about the last point your opponent makes, that you obviously need a policy that tells doctors when they have to come, that you can't leave it up to the doctor's judgment to decide on the telephone, that at least there's a factual question about whether a policy is necessary, if doctors can't be counted on to come under circumstances such as this? Well, here, the county did have a policy of hiring licensed doctors and nurses to take care of its patients. And all of the doctors and nurses... What else could they do? That's not a policy. That's a basic minimum requirement of law. The county didn't adopt a policy saying we're going to hire doctors and nurses. Is that all the policy you think the county has to have in treating people in the jails? No, the county did have some policies. It had some policies about documentation. It had some policies about how to transfer patients. But the most important thing here is that the county has to be found to be deliberately indifferent. And here, what it did was it hired licensed doctors and nurses to provide patient care. And what we're talking about is asking the doctors and nurses to determine when a patient is medically unstable. All the doctors knew, all the doctors and nurses knew the limitations of the Medical Services Bureau. They knew that if a patient was unstable, the patient would have to be transferred to the hospital. The issue is... Well, the issue, according to Mr. Burke, is whether or not they did it. But the real issue is, was there... The real issue is that the county hired these doctors and nurses and asked them to basically follow the standard of care. And if the doctors didn't follow the standard of care, then that might be a malpractice suit. But it doesn't show that the county was deliberately indifferent, unless the county had some reason to believe that the doctors and nurses couldn't be counted on to follow the standard of care. Your basic position is that all the county has to do is hire doctors and nurses. And because they're medical professionals, they don't need the county to adopt a policy telling them what to do with respect to their practice. Or train them any further. Well, it might have to provide them some sort of training. But here, we're talking about training the doctors how to recognize when a patient is medically unstable. And that's something that they would learn in medical school. The county can't really train them to determine when a patient is medically unstable, because that's part of the healing art that they learn in medical school. The county would have to have voluminous policies or years and years of training to replicate what the doctors and nurses would learn in medical school to be able to tell the doctors how to recognize when a patient is medically unstable. In other words, there wasn't a simple policy that the county could have to say when a patient had- That same view of yours applied to police officers and defense counsel, that because they graduate from law school, they know how to practice, and therefore the county doesn't have to train lawyers and police officers who graduate from post or whatever training they need before they get certified. Police departments don't need training either because they're trained police officers when they're hired. Well, it seems that going back to lawyers who receive training in law school, it seems that your honors may be referring to the situation in Gibson, where the public defender's office had a policy of assigning the least experienced lawyers- I think that's Miranda you're talking about. Oh, I'm sorry. Yes, you're right. It is Miranda. In Miranda, the public defender's office had a policy of assigning least experienced lawyers in the office to death penalty cases. And the court there actually said that this was deliberate indifference because it was not merely an isolated assignment of an inexperienced lawyer, but a deliberate policy of refusing to train lawyers for death penalty cases that the administrators knew exert unusual demands on attorneys. So in that particular case, the county public defender's office knew or had reason to know that these particular types of cases would require especially experienced lawyers, and yet they failed to do anything about it. But here, we're not talking about asking a dermatologist to do brain surgery or a general practitioner to do something like brain surgery, or in other words, to deal with a type of situation that they should know would be unusually demanding and that an inexperienced doctor couldn't do. Here, we had the county delegating the responsibility to doctors, and in fact, one of the doctors here had 16 years of experience with the county. It's been a county doctor for 16 years. And basically, the county was relying on these doctors just to determine when a patient is medically unstable. That's not comparable to assigning a lawyer fresh out of law school to try a death penalty case, which the county public defender's office knows is an especially difficult case. Here, we're talking about something pretty basic, just determining when a patient is medically unstable. The plaintiff had a couple of expert witness doctors. How would you say that what they said doesn't raise at least a disputed issue of material fact? Well, the plaintiff's experts spoke to – well, the plaintiff's experts basically said that the county doctors and nurses here didn't follow the standard of care. They didn't do what they should have done. They saw particular symptoms, and they didn't realize or they didn't act on the knowledge that this patient was medically unstable. So if anything, that evidence goes to the question of medical malpractice or whether the doctors in this particular situation failed to provide adequate care. It doesn't speak to whether the county had a policy of providing inadequate care or failing to train the doctors. I thought Counsel said that the experts opined that the lack of a policy was deliberate indifference. I believe that's true, but deliberate indifference is a legal question that his doctor experts can't opine on. They can opine on the standard of care. They can opine as to whether the doctors and nurses should have done something, but I don't think they can opine on whether the county policy caused the doctors. I thought experts could opine on the ultimate question, but it's still up to the judge or the jury to make the ultimate determination, but the expert can opine on that. What case authority are you relying upon to support your argument that experts cannot opine on the ultimate question of law? I don't have authority for that proposition, Your Honor. My larger point is that the question of deliberate indifference is a question for the jury, or if there's no evidence that a jury could return a verdict on, then it's a question for Your Honors. So even if the expert states the opinion that this was deliberate indifference, it's still up to the jury or the court to determine whether there actually was. That's just the point. The point is, why isn't that enough to take this case to a jury? Because here there is no evidence of deliberate indifference. In other words, to show deliberate indifference, we have to show that the county, that there was a need to train or a need to have a policy that was so obvious that a reasonable person would recognize the need. And I don't think the expert declaration is in this. Well, I guess that's the basic question. Do doctors need policies? Or because they've gone to medical school, is that enough? Can a hospital just hire doctors and say, okay, fellows, you're on your own. Not treat people. Or does a hospital have to have policies that guide doctors and tell them when they must examine patients, when they must take them to another facility, when they must go to a committee of other doctors? Is it enough just to say doctors are trained? And if not, what kind of policies are required? Is there a policy required here telling doctors how they should react when they get calls that people are in the kinds of circumstances the decedent was in here? I can't speak on every situation that might arise. But there could conceivably be a situation where the county would be required to have some sort of policy,  for instance, the county might be required to tell the doctors when they arrive, here is what the MSB offers, the Medical Services Bureau offers. Here are the limitations of the MSB. Here's what the hospital provides. So in other words, they might have to train the doctors as to the particular facilities. But that's different from saying you have to train the doctors to recognize when someone's unstable. Because here, all the doctors and nurses testified that they knew that if a patient became unstable, they had to transfer them to the hospital. They knew that. There was no policy. But the nurse couldn't transfer them. Only the doctor could transfer them. And there was nothing to say that the doctor had to see them in order to decide whether to transfer them. Is that right? Yes. Well, that's true. But the county was relying on the nurses to know when a doctor had to be summoned. And that's actually common practice in hospitals. So, for instance, if someone's a patient in a hospital and they press a call button, the doctor doesn't come. The nurse comes. And then the patient generally talks to the doctor. But the nurse can only say to the doctor, here are the circumstances. That's right. She can't say to the doctor, it's your duty to come. You may not talk to him on the telephone. That's not the nurse's function. She did what she was supposed to do, called the doctor, told him what was going on. The question is, do you need a policy that requires doctors to go to the jails? Or are they permitted just to act over the telephone and not see the patients? Well, in this case, the issue there seems to be that, well, the nurse did notify the doctor, but the doctor didn't come. It's up to the doctor's independent professional judgment to determine whether they can diagnose the patient without seeing them or whether they actually have to see them. So if the county had a policy that doctors had to come to the jail, would the doctor have been obligated to come if he were called by the nurse? If the county had a policy, I would assume so, yes. So regardless of whether in his independent judgment he felt he should come or should not come, if there were a policy, regardless of how he felt independently, he'd have to come. Wouldn't that be right? That's true, but it sounds like what Your Honor is saying is that the county should have had a backup policy in case the doctors failed to follow the standard of care. But it seems that what plaintiff's experts here are saying is that the doctors didn't follow the standard of care. It's not deliberate indifference for the county not to have a policy requiring the doctors to follow the standard of care, unless there was some reason for the county to know that doctors weren't following the standard of care. Thank you, Counsel. We've gone a couple of minutes over already. Thank you, Your Honor. Thank you very much. Counsel, we'll give you, if necessary, up to three minutes so you have equal time. But don't feel you have to use it all. No, no, I won't. I appreciate it, and I know your time is important. I'll just say very briefly and try to get the points. First of all, I think that it's a jury question as to whether this reflects deliberate indifference, and the experts say that it does, and the experts looked at everything. Look at the oxygen situation. The patient refuses oxygen, and at Excerpt of Record 77, the only policy, Dr. Johnson says, when you refuse oxygen, you give the patient a release of reliability form. Well, if they can have a policy to give a patient a release from a reliability form, shouldn't a jury be permitted to conclude that that would indicate that this entity has prepared in advance and knows that they could face liability, which means there could be harm, and they should have had a policy to also require a doctor be contacted? Is that too much to ask? Well, Counsel, a doctor was contacted, though. Not when the oxygen was refused. The only thing that happened was a release from no doctor was called when the oxygen was refused. Well, you're talking about that finite circumstance. The fall, yes. And only the second fall. The first fall, no doctor was contacted. In the first fall, a patient fell, and we know from the medical evidence that that is also a potentially traumatic incident. No doctor was called. I don't see anything in the record saying that medical schools or nursing schools would teach prison medicine or other types of medicine the way in Miranda you would say that there's a certain protocol that you could call someone to follow. But, Counsel, you're not suggesting, are you, that the county had the obligation to have a policy that any time a patient falls that a doctor must see that patient? Actually, I am. I think that there are protocols in hospitals that both nurses say that that's the correct. If you have a patient in a vulnerable medical condition, and I think that's the key, then that can indicate instability. That can indicate hypoxia. That's the evidence from the experts. It can indicate disorientation. And so a nurse should call a doctor to make that judgment. And that's what the experts believe. And if that's too much, then they should transfer that person to a place they can get the monitors, the 24-hour care that they need, or they shouldn't take patients like this at the MSV unit because this person died 18 days after having been received because of the fact that he was steadily deteriorating in the experts' views. So if a person slips on a bar of soap and falls, do you think that a doctor has to see that patient? If a person slips on a bar of soap and there is nothing indicating any possibility of anything worse, maybe not. But if there is an incident where a patient is falling and a patient is in a vulnerable medical condition because of, in this situation, what they said, a host of serious medical problems such that any instability, even shortness of breath, would lead and should lead to an immediate transfer where he could be monitored, yes. But that's the difficulty with having a global position. Anytime a patient falls, he or she must be seen by a doctor. That's the difficulty with trying to articulate a policy because it can go too broadly. Well, it can go too mildly. I mean, I think that you're saying that because I think the job may be tough, but that doesn't mean they can't and shouldn't do it. They should define what instability, what patients, to what patients instability is important. Cardiac patients, patients who have a host of medical problems. And with those people, they have to monitor them closely because they have no doctor half the time, as you've seen in the evidence. So with those patients, yes. With a patient who's there for a stubbed toe, no. But with a patient who is in an acute situation such as this person and is a district court pound, and the district court's opinion at 1132 was, I'm sorry, page 131 of the excerpt of record was, and 132 was, that the county's policy, only policy, was to leave it to the doctors. I think a jury should be able to conclude, assess the evidence, listen to the experts, and conclude that more was needed here and that they had noticed that people with serious medical problems come into the jail and that more had to be provided in the way of definition, protocol, and policy. And the proof is in the pudding. Okay. Thank you very much. I'm sorry for going on. Okay. This argument will be submitted.
judges: Reinhardt, Rawlinson, Wilken